UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | 18 CR 496 |
| v. | |
| FELICIA BRINSON | Judge Virginia M. Kendall. |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MOTION TO SUPPRESS STATEMENTS

The UNITED STATES OF AMERICA, by and through its attorney, JOHN R.

LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby

responds to defendant Felicia Brinson's Motion to Suppress Statements ("Motion").

Dkt. #49.

## I.     INTRODUCTION

### Search Warrant

On July 27, 2018, at approximately 6:59 a.m., an armed guard/ATM

technician employed by Loomis Armored U.S. was robbed at gunpoint by an

unknown black male, later identified as Ivan Parker, while servicing a Chase Bank

ATM, located at 3856 West 26th Street, Chicago, Illinois. Parker stole approximately

$106,335. *See* Exhibit A. On August 10, 2018, the United States District Court for

the Northern District of Illinois issued a search warrant for 4244 West Cermak,

Unit 2ER, Chicago, Illinois ("the Subject Premises"), believed to be Parker's

residence.

On that same day, prior to executing the search warrant, the FBI agents

conducted physical surveillance in the area of the Subject Premises. Agents

observed Ivan Parker entering and exiting the north side of the building containing the Subject Premises.

At approximately 3:50 p.m., after observing Parker re-enter the building, the FBI began attempting to enter the building. The FBI knocked and announced at the Subject Premises, and a woman later identified as defendant Felicia Brinson answered the door at the Subject Premises. The FBI cleared the Subject Premises for additional persons, and no one else was inside the Subject Premises. The Subject Premises was a one bedroom apartment.

**Defendant's Statements at the Subject Premises**

The following statements regarding what happened in the apartment are based on a 302, which has been provided to defendant. Just after approximately 4 p.m., defendant was advised that a search warrant was being executed at the Subject Premises and that she would be provided with a copy of the search warrant at the conclusion of the search. Defendant was advised that she was not under arrest and was asked whether she would consent to an interview. Defendant agreed to an interview, during which she had a cigarette, could use the restroom, and had a bottle of water.

Defendant provided her date of birth and cellular phone number. Defendant stated that she lived in the apartment with her boyfriend, Ivan Parker. Defendant said she had been in a relationship with Parker since 2015 and provided his date of birth. Defendant stated that Parker did not have his own cellular phone, and they

shared hers. Defendant stated that she and Parker were the sole occupants of the apartment.

Defendant stated that she was formerly employed for a company, and she provided the name and address of the company. Defendant stated she had been laid off from work approximately two Tuesdays prior.

Defendant was asked where Parker was located. Defendant stated that she had not seen Parker since earlier in the morning. Defendant stated she believed Parker took the bus or train to renew his license as they did not have a car, bicycle, or other means of transportation. Defendant stated that neither she nor Parker rode bicycles.[1]

During the interview, as specific items were recovered, defendant was asked about the specific items by the various agents who recovered the specific item(s). Among the items of evidence found during the execution of the search warrant in addition to approximately $7,010 in cash, law enforcement recovered a .25 caliber pistol with three live rounds of ammunition, a bag containing what appeared to be crack cocaine, and approximately 28.5 grams of cannabis. The firearm and crack cocaine were found together inside the bedroom inside of a black plastic bag and a white towel, both of which were inside a laundry hamper. Defendant was asked about a firearm and illegal drugs found in the apartment bedroom. Defendant immediately claimed ownership of both the firearm and drugs. Defendant went on to identify the drugs as crack cocaine and marijuana.

---

[1] The lone male robber rode a bicycle after fleeing on foot.

Defendant elaborated that she purchased the crack from a "Mexican" with the first name Francisco that she formerly worked with at her last place of employment. Defendant said she purchased the crack for later resale so she could make money after being laid off. Defendant believed she made the purchase of the crack during the week before she was laid off. Defendant claimed that the marijuana was for personal use.

Defendant stated that she obtained the gun from a childhood friend by the name of "Maurice Griffin," who lived on the same block as the location of defendant's former family home, located at 729 North Drake, Chicago, Illinois. Defendant said that Parker knew the firearm was in the apartment. Defendant said she had applied online for a FOID Card on August 5, 2018.

Defendant made statements about: her sources of income and her monthly rent for the apartment; details about the cellular phones she and Parker used and provided cellular phone numbers and their Wi-Fi passcode; and where she banked. FBI told defendant that some of the items recovered during the search indicated purchases made within the past two weeks. Defendant stated that she had either paid cash or used her debit card for all of the recent purchases.

Defendant was shown a canister of pepper spray that had been recovered in the apartment.[2] Defendant said the pepper spray belonged to her and she added that she carried the pepper spray for personal protection. Defendant said the pepper spray had never been used, but then she said she had previously used the pepper

---

[2] The lone male robber used pepper spray on the ATM technician during the robbery.

spray to see if it worked. Defendant said she purchased the pepper spray at Cook Brothers, located near St. Louis and Chicago Avenue.

Defendant was asked about other items that were recovered such as lottery tickets, jewelry, and the receipt for the purchase of two money orders totaling $2,650. Defendant provided responses as to how those items were acquired.

At approximately 5:25 p.m., defendant was reminded of the serious nature of the investigation and the importance of providing truthful answers. Defendant was again asked about the firearm, crack cocaine, and marijuana that defendant said belonged to her and whether those items actually belonged to her. Defendant answered yes. Agents also recovered mail addressed to defendant with an address of the Subject Premises. Defendant was advised that she was being placed under arrest and that no further questions would be asked of her until she was at the FBI office.[3]

**Defendant's Statements at FBI**

As reflected on the video recording, defendant was in the interview room by herself for approximately 16 minutes before the two interviewing agents entered the room. As reflected in the recording, prior to the initiation of the custodial interview, defendant was advised of her *Miranda* rights with an FBI Advice of Rights form. One agent read the form aloud to defendant and instructed defendant to read along. Defendant acknowledged that she understood each of her rights. Defendant then read the last sentence of the form aloud and verbally stated that

---

[3] Parker was arrested in a different apartment in the building on that same day.

she understood her rights and was willing to speak with the two interviewing agents. Defendant waived her rights in writing and signed the Advice of Rights form. *See* Exhibit B.

After waiving her *Miranda* rights, defendant said that she had resided at the Subject Premises for approximately one year. Defendant stated that the gun and cocaine found in her apartment were her friend's and she was holding the items for him. Defendant stated that the marijuana was hers. Defendant reaffirmed that she had previously told law enforcement that the gun and the crack cocaine belonged to her.

Defendant identified the friend for whom she was holding the gun and cocaine as "Terrell Green." Defendant further stated that she went to school with Green and had known him and his family for a while. Defendant stated that she also used to date Green in grammar school. Defendant said that Green told defendant that he did not want to hold the gun and cocaine at his house. Defendant stated that she told Green that she would hold the items for him. Defendant said that Green paid her $300 approximately one week prior to hold the gun and cocaine. Defendant confirmed that she had initially told the FBI during the execution of the search warrant that she bought the cocaine to sell because she got laid off from work, but she said that was not the truth. Defendant said that the truth was she was holding it for Green.

Defendant said she received the gun and cocaine from Green on her old block near Chicago and Drake in Chicago, Illinois. Defendant stated that at the time she

received the items from Green, she was hanging with her best friend, "Donshay Harris," but Donshay did not know defendant took the gun and cocaine from Green. Defendant stated that Donshay was stored in her phone as "Shay."

Defendant said that she gave Green her cellular phone number for Green to call defendant when Green wanted to pick up the gun and cocaine. Defendant said that she did not know Green's phone number, and she had no way to get in contact with Green other than seeing him on the block. Defendant gave a description of Green to include his approximate age, physical appearance, and tattoos. Defendant stated that Green lived on the 600 block of Trumbull Avenue in a stand alone house with his family near the intersection of Trumbull and Ohio.

Defendant said Green gave her the gun and cocaine in a bandana. Defendant said she then put them in her bag to take home. Defendant said when she got home, she removed the gun and cocaine from her bag, wrapped it in a towel, placed it in a shoe box, and stored it on the shelf in her bedroom closet. Defendant stated that no one, including Parker, knew she had the gun and cocaine in the apartment.

Defendant stated that she had smoked marijuana earlier that day before eating breakfast at approximately 10:30 a.m. Defendant stated that she was not under the influence of drugs at the time of the interview.

Defendant was asked and coherently answered questions about Parker, and she indicated that she had no idea why the FBI had executed a search warrant at her apartment. Then, defendant gave coherent information about her prior

employment, banking, and how she recently acquired clothing, shoes, jewelry, and a television.

Defendant also stated that she did not know about a large sum of money in her apartment. Defendant said she estimated that Parker would earn up to $1,200 per day if he sold heroin. Defendant said Parker gave her some of that money to help pay the bills.

Defendant said she also got money selling "jabs," which she described as cocaine and heroin. Defendant said the only time she touched the cocaine was to take it out of her bag and put it in the shoebox. Defendant said the last time she sold cocaine was approximately two months prior.

Defendant provided details and told agents about she and Parker's activities on July 27, 2018, which was the day of the robbery.

The interview was paused, and the interviewing agents left the room. The two interviewing agents subsequently returned to the interview room and resumed the interview.

Defendant was shown a photograph and asked if she recognized the person depicted in the photograph. Defendant stated that she did not. Defendant said that she did not know anything about a robbery. Then, defendant again provided coherent details about she and Parker's activities on July 27, 2018, which was the date of the robbery.

**Lab Results**

The suspect crack cocaine was sent to the Drug Enforcement Administration (DEA) laboratory for testing and analysis, and it was determined that it weighed approximately 77.3 grams and contained cocaine base. *See* Exhibit C.

## II.  ARGUMENT

The court should deny the defendant's motion to suppress statements because (1) defendant was not in custody when she made her first statements in the apartment and, accordingly, they were not the result of custodial interrogation; (2) defendant's statements were made knowingly and voluntarily, as she was not intoxicated, and even so, voluntary intoxication is legally insufficient to negate voluntariness; (3) defendant knowingly and voluntarily waived her *Miranda* rights on video and with a signed waiver prior to making statements after she was taken into custody; and (4) there are no facts to support the allegation by defendant that her statements were involuntary or coerced.

### A.  Defendant's statements while in the apartment were not made while in custody and do not constitute custodial interrogation.

Defendant moves to suppress the statements she made in her apartment because she claims that they were the result of custodial interrogation without *Miranda* and in violation of the Fifth Amendment. She also argues that she was under arrest without probable cause upon law enforcement's entry into her apartment to execute the search warrant and that her statements in her apartment were in violation of the Fourth Amendment. Dkt. 49 ¶ 15.  Her motion should be denied because the defendant was not in custody at the time she made the

statements in the apartment. Accordingly, her statements were not the result of custodial interrogation such that *Miranda* was implicated, nor were they obtained following an arrest without probable cause.

The Fifth Amendment protects against compulsion of an accused's incriminating communications. For this reason, law enforcement may not conduct custodial interrogation without first advising the accused of his rights under the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). The protections of *Miranda* do not apply outside of custodial interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). A suspect must be both in custody and subject to interrogation before the *Miranda* warnings requirement is triggered. *United States v. Yusuff,* 96 F.3d 982, 987 (7th Cir. 1996), *cert. denied,* 519 U.S. 1134 (1997).

Whether a person has been seized—and is thus in custody—is determined by looking at whether a reasonable person, innocent of any crime, would have concluded that he was not free to leave. *A.M. v. Butler*, 360 F.3d 787, 798 (7th Cir. 2004). "The test provides that the police can be said to have seized an individual 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Michigan v. Chesternut*, 486 U.S. at 573 (*quoting United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Courts look at a totality of the circumstances when assessing whether a defendant is in custody and consider whether a reasonable person would have felt free to leave. *United States v. Thompson*, 496 F.3d 807, 811 (7th Cir. 2007) (interrogation at defendant's home was not custodial where defendant invited agents in, agreed to

be questioned, and agents did not raise their voices, display their weapons, or physically retrain defendant).

Specifically, courts weigh factors such as (1) whether the encounter occurred in a public place; (2) whether the suspect consented to speak with the officers; (3) whether the officers informed the individual that she was not under arrest and was free to leave; (4) whether the individual was moved to another area; (5) whether there was a threatening presence of several officers and a display of weapons or physical force; and (6) whether the officers' tone of voice was such that their requests were likely to be obeyed. *United States v. Barker*, 467 F.3d 625, 629 (7th Cir. 2006).

Defendant could not have reasonably believed that she was in custody, and thus, her statements in the apartment should not be suppressed. Agents interviewed defendant in her own home; defendant consented to speak with the agents; defendant was informed that she was not under arrest; and no physical force was used. *See Beckwith v. United States*, 425 U.S. 341, 347-48 (1976) (three-hour interview in suspect's home did not amount to custody). The agents were not in defendant's residence for reasons pertaining to her, and she was not a suspect of any offense. After a gun and drugs were recovered, agents asked whether she knew anything about the items, just as they asked her about numerous other items recovered in the apartment. Prior to being informed of the type of narcotics, defendant indicated that the drugs in the apartment were marijuana and "crack." Before the agents arrested defendant and took her into custody, they reminded her

of the need to be truthful, and she confirmed that the firearm and crack belonged to her.

Here, defendant was not in custody when she made statements in the apartment. Thus, those statements were not the result of an arrest without probable cause or a custodial interrogation conducted without the benefit of *Miranda* warnings.

## B. Defendant was not intoxicated. Moreover, assuming, *arguendo*, that she was intoxicated, voluntary intoxication is legally insufficient to negate voluntariness.

Defendant's next argument in support of suppressing the statements also fails. Defendant claims that she was "under the heavy influence of narcotics" such that she could not voluntarily waive her rights once in custody in the FBI holding room. Dkt. 49 ¶ 17. Based on her alleged inability to voluntary waive her *Miranda* rights, defendant argues that her statements at the FBI office must be suppressed. What defendant fails to address is that if, in fact, defendant had voluntarily become intoxicated, then that is still legally insufficient to negate voluntariness.

A confession is voluntary "if, in the totality of the circumstances, it is the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004). Importantly, "to find that a confession is involuntary, [the Court] *must* conclude that it is the product of coercive police activity." *Carrion v. Butler*, 835 F.3d 764, 775 (7th Cir. 2016) (emphasis added); *see Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "[I]ntoxication alone does not show involuntariness." *Carson*, 582

F.3d at 834 (citing *United States v. Chrismon*, 965 F.2d 1465, 1469 (7th Cir. 1992) (stating that "a defendant's intoxication . . . —without some showing of coercion by the government—will not negate voluntariness.")).

Where a defendant claims that she was intoxicated but does not "detail any facts showing mental or physical coercion by the police" she cannot "meet [her] burden of showing a prima facie case of involuntariness." *United States v. Terrell*, 12 CR 49, 2014 WL 5423067, at *4 (N.D. Ill. Oct. 22, 2014) (citing *Toro*, 359 F.3d at 885); *see also Chrismon*, 965 F.2d at 1469 ("a defendant's intoxication or low intelligence by itself—without some showing of coercion by the government—will not negate voluntariness."); *Andersen v. Thieret*, 903 F.2d 526, 530 n. 1 (7th Cir. 1990) (defendant's "intoxication by itself could not support a finding of involuntariness and is relevant only to the extent it made him more susceptible to mentally coercive police tactics.").

Defendant has failed to attach an affidavit and in support of her Motion. The facts as alleged by defendant are many times contradicted by the record and video recording. A defendant bears the burden of making a prima facie showing of illegality in moving to suppress statements. *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992). "Reliance on vague, conclusory allegations is insufficient." *Randle*, 966 F.2d at 1212. Courts have found that defendants have not met that prima facie burden, in cases where the motion to suppress depends on factual disputes, where defendants have failed to submit an affidavit from someone with personal knowledge of the allegations asserted. *Id*. Defendant was not

intoxicated. Moreover, notwithstanding defendant's failure to attach an affidavit, voluntary intoxication is legally insufficient to negate voluntariness, absent coercion.

Here, defendant's argument that she was under the influence of narcotics when interacting with law enforcement is belied by the record. As can be seen and heard in the video recording of defendant after she was taken into custody that evening, defendant was not intoxicated. Defendant stated that she had smoked marijuana earlier that day before eating breakfast at approximately 10:30 a.m. When asked whether she was under the influence of drugs, defendant made a face as if that was a ridiculous question and confirmed that she was not under the influence of drugs at the time of the interview.

Although defendant admitted to smoking marijuana earlier that day, the video recording shows that defendant listened to questions and responded coherently to the questions. Defendant's answers were detailed and responsive to the questions with no indication of any problem thinking straight. Defendant also wrote legibly when signing her name. All of this indicates that defendant knowingly and voluntarily spoke with law enforcement, as she was not intoxicated.

Therefore, because the record belies that defendant was intoxicated, her motion should be denied as her *Miranda* waiver and statements were voluntary. Moreover, even assuming *arguendo* that defendant was intoxicated, voluntary intoxication is legally insufficient to negate voluntariness where there is no indication of coercion.

**C.** **Defendant knowingly and voluntarily waived her *Miranda* rights prior to making statements while in law enforcement custody.**

As explained above, defendant's argument that she was too intoxicated to voluntarily waive her rights is factually incorrect. Defendant argues that even so she was not 'adequately and effectively apprised of her rights,' and therefore, defendant's statement after she was taken into custody should be suppressed. Dkt. 49 ¶ 18. The *Miranda* warnings provided by law enforcement were effective. As can be seen on the video recording, the *Miranda* warnings provided to defendant were sufficient as defendant stated she understood them and affirmatively waived them on video and with a written *Miranda* waiver.

Law enforcement agents have probable cause to arrest when the totality of the circumstances presented "are sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense." *United v. Sawyer*, 224 F.3d 675, 678-79 (7th Cir. 2000). Probable cause "is a fluid concept that relies on the common-sense judgment of the officers." *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006). The admissibility of a custodial statement is conditioned upon a precedent warning from law enforcement regarding a suspect's rights against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436 (1966). Failure by law enforcement to give the prescribed warnings and obtain a waiver of rights before custodial interview generally requires exclusion of any statements obtained. *Missouri v. Seibert*, 542 U.S. 600, 608 (2004).

Law enforcement officers were confronted with the situation of executing a search warrant at an apartment for evidence of an armed robbery, where they

recovered not only a firearm, but also crack and cannabis. Then, during their routine interview of an occupant of the apartment, they were told by that occupant that the firearm and narcotics belonged to her, although she was not the subject of the current investigation. Law enforcement reminded her that it was a serious investigation. Defendant again confirmed that the firearm and crack were hers. It was at that time that defendant was taken into custody.

Here, the facts in defendant's case demonstrate that she knowingly and voluntarily waived her *Miranda* rights once she had been taken into custody as captured on the video recording. *See* Exhibit B; *see also Zachary v. Finnan*, 436 Fed.Appx. 682, 2011 WL 3702070 (7th Cir. Aug. 24, 2011) ("By nodding [the defendant] signaled that he understood the rights [the law enforcement officer] was explaining to him") (*citing United States v. Browning*, 436 F.3d 780, 780 (7th Cir. 2006) (dismissing "frivolous" argument that suspect cannot indicate comprehension of *Miranda* rights by nodding head); *United States v. Smith*, 218 F.3d 777, 780-81 (7th Cir. 2000); *United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir. 1996)).

Defendant was read her *Miranda* rights as she followed along with the agent. Defendant stated that she understood her rights. Then, defendant agreed to waive those rights and signed a written waiver. As explained above, the video recording shows that defendant was coherent, responsive, and provided details in her answers, interacting with law enforcement as one who was sober and comprehending. Accordingly, defendant knowingly waived her *Miranda* rights and the statements given after she was taken into custody should not be suppressed.

### D. Defendant's statements were given knowingly, freely, and voluntarily.

Defendant argues that her statements were coerced and involuntary. Dkt. 49 ¶ 23-24. Law enforcement's actions were not coercive, threatening, or promissory toward defendant. Defendant states that "the coercive nature of the custodial interrogation by threating to incarcerate her if she did not cooperate" is belied by the record. *Id.* ¶ 21. Defendant had already been arrested in the apartment, and as can be seen on the video of the custodial interrogation, defendant was never asked to cooperate, but only reminded to be truthful. Defendant also states that she "was detained for several hours during which she was not allowed to use the bathroom, eat, drink, or contact counsel, friends, or family." Again, defendant's statements have no basis in fact. Defendant was asked multiple times whether she needed anything. Defendant is drinking water during the video. Moreover, after being provided her *Miranda* rights and knowingly and voluntarily waving those rights, defendant never requested an attorney.

Again, a confession is voluntary if, "in light of the totality of the circumstances, the confession is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004); *United States v. Abdulla*, 294 F.3d 830, 836 (7th Cir. 2002) (quoting *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)). "[C]oercive police activity is a necessary predicate to the finding that a confession is not voluntary." *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir.

1998). No such coercion was present here. Consequently both defendant's statement at the apartment and at the FBI office were voluntary.

Here, the facts indicate that defendant's statements were voluntary, and defendant does not allege that there were any actions that overcame her free will. There is none of the facts indicate that defendant was subjected to any coercive tactics by law enforcement. Accordingly, defendant's motion should be denied as defendant's statements were giving knowingly, freely, and voluntarily.

**E.    Defendant's statement while in custody at the FBI office is admissible, as both defendant's pre-custody and post-custody statements were made voluntarily.**

Defendant adds that even if the *Miranda* warnings were sufficient in the custodial setting once at the FBI office, those statements should be suppressed because she argues that the agents used 'the two-step interrogation technique' 'in a calculated way to undermine the *Miranda* warnings.' Dkt. 49 ¶ 22. Here, the officers did not talk to defendant with the intent to circumvent *Miranda*, and accordingly not only are defendant's initial voluntary statements admissible, but her statements during custodial interrogation after she knowingly and voluntarily waived *Miranda* are also admissible.

Any taint from a prior un-Mirandized confession can be removed by subsequent administration of *Miranda* rights and waiver of those rights so long as the first confession was voluntary. *See Oregon v. Elsted*, 470 U.S. 298 (1985); *United States v. Detella*, 122 F.3d 450, 453-54 (7th Cir. 1997); *United States v. Muhammad*, 120 F.3d 688, 697 (7th Cir. 1997). *See also Stawicki v. Israel*, 778 F.2d 380, 382-83 (7th Cir. 1985), *cert. denied*, 479 U.S. 842 (1986). If the court finds that the first

statement was voluntarily made, despite having been in technical violation of Miranda, the court then should suppress the statement given after the Miranda warning only if it finds that the subsequent statement was not voluntarily made. *United States v. Gonzalez-Sandoval*, 894 F.2d 1043, 1049 (9th Cir. 1990) (citation omitted). When making this determination, the court examines such factors as the length of time between confessions, any change in the place of interrogation, and any change in the identity of the interrogators. *Detella*, 122 F.3d at 454.

Four cases govern the Seventh Circuit's approach to this issue: *Oregon v. Elstad*, 470 U.S. 298 (1985); *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality opinion); *United States v. Stewart*, 388 F.3d 1079 (7th Cir. 2004) ("*Stewart I*"); and *United States v. Stewart*, 536 F.3d 714, 718 (7th Cir. 2008) ("*Stewart II*"). In *Elstad*, the Supreme Court held that the admissibility of a post-warning confession obtained after an earlier, unwarned inculpatory statement turns upon whether the pre- and post-warning statements were voluntary. 470 U.S. at 310-11. If the unwarned, first statement is voluntary, then the second statement is admissible, provided it too is voluntary and obtained in compliance with *Miranda*. *Id.* at 318. If the unwarned, first statement is involuntary, however, the admissibility of the second, warned statement depends upon whether there is a sufficient separation in time and circumstances between the first and second statements such that the coercive taint of the former does not carry over to the latter. *Id.*

In *Seibert,* the Court examined *Elstad*'s application to a so-called "two-step" interrogation process, during which *Miranda* warnings are deliberately delivered

mid-interrogation after an initial and unwarned inculpatory statement by the suspect. 542 U.S. at 604. Although the Court ultimately suppressed the specific unwarned statement at issue, it did not achieve a majority opinion regarding how future sequential interrogations should be evaluated.

In *Stewart I*, the Seventh Circuit reconciled *Seibert*'s plurality and concurring opinions. Under *Stewart I*'s interpretation, *Seibert* altered *Elstad*'s approach in certain respects. In cases *not* involving the deliberate use of a two-step interrogation, *Stewart I* held that "*Elstad* appears to have survived *Seibert*." 388 F.3d at 1090. When a deliberate two-step interrogation *is* employed, "the central voluntariness inquiry of *Elstad* has been replaced by a presumptive rule of exclusion." *Id*. This presumption can be overcome, however, by a "change in time, place, and circumstances from the first statement to the second," *id*., such that "a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning." *Id*. at 1089 (quoting *Seibert*, 542 U.S. at 622). This multifactor test examines, *inter alia*, "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615.

The Seventh Circuit reaffirmed this interpretation four years later in *Stewart II*, and further declared that the issue of whether the police deliberately used a two-step interrogation method "is a factual inquiry." 536 F.3d at 719. Under *Stewart II*,

where a defendant's confession is obtained during a sequential interrogation "with *Miranda* warnings delivered midstream," the government bears the burden of proving that police "did *not* deliberately withhold the warnings until after they had an initial inculpatory statement in hand." *Id.* (emphasis in original).

Here, defendant's statements at the apartment were not only voluntary, but also were not provided in violation of *Miranda*, as explained above. Defendant's post-arrest *Miranda* warnings and waiver were not provided in a mid-stream interview. Although defendant's post-arrest interview occurred that evening after her arrest and was conducted by two of the officers present in the apartment, defendant's pre and post-arrest interviews occurred in two separate locations, defendant's own environment where agents were investigating her boyfriend and the FBI office where agents had taken defendant into custody and were clearly now interested in her. Moreover, defendant's pre-arrest statement was not "systematic" and "exhaustive," with the "psychological skill" described in *Seibert*, 542 U.S. at 615, but instead corresponded to the execution of the search warrant as evidence was recovered.

Therefore, the voluntary, non-custodial statements at the apartment, did not taint the properly *Mirandized* post-arrest statements at the FBI office, and accordingly, defendant's motion should be denied.

## III. EVIDENTIARY HEARING

If there is an evidentiary hearing, it should be limited to what happened at the apartment with regard to whether defendant was in custody because anything

outside of that is refuted by the video recording. *See United States v. Edgeworth*, 889 F. 3d 350, 354 (7th Cir. 2018).

## IV.    CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendant's Motion.

<div style="margin-left: 40%;">

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    */s/ Tobara S. Richardson*
TOBARA S. RICHARDSON
Assistant United States Attorney
219 South Dearborn Street, Rm. 500
Chicago, Illinois 60604
312-469-6305

</div>

Dated: March 15, 2019